[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for breach of a building contract.
By a contract made on August 25, 1980 the plaintiff agreed to construct 30 dwelling units for the defendant on the project to be numbered E-121 which was Rental Homes for Elderly citizens in North Branford. The contract required the work to start on September 1, 1980 and to be completed, except for landscaping, in 365 consecutive calendar days.
The work under the contract progressed slowly because there arose many controversies, with much bickering and arguments about the work, and how it was to be done. It would serve little purpose to detail these problem areas. The fact is that the work went forward as shown by the "Periodical Estimates For Partial Payment" under the contract. These were requisition made by the plaintiff asking for payments for work it had done up to the date of the requisition. These requisitions were reviewed by all concerned and then signed by each to indicate approval.
However, before the project was completed by a letter dated CT Page 11656 July 24, 1981 and received by the plaintiff on July 27, 1981 the plaintiff was ordered to terminate its work on the project immediately. It did so.
Nine months later, on April 2, 1982, the plaintiff filed this action in the Judicial District of Waterbury. Then on March 19, 1987, five years later, it was referred to the undersigned, who had agreed to hear it. The first day of the hearings was March 14, 1987. Four (4) years and two (2) months later, after 73 days of hearings, the evidence was completed. That day was May 14, 1992. Fifteen witnesses testified for the plaintiff, nine for the defendant. The plaintiff's brief is dated July 15, 1992, the defendant's is dated November 4, 1992 and the plaintiff's reply brief is dated December 10, 1992.
 I.
Liability
The termination letter was addressed to the plaintiff, was signed by William Manzi, Chairman of the defendant Housing Authority. Copies were sent to Connecticut state Housing and to St. Paul Fire and Marine Insurance Co.
There are four reasons given for the termination. These are set out in the first paragraph of the letter of July 24, 1981. They read as follows:
 "Pursuant to Sections 13 and 15 of the Contract General Conditions for the construction of North Branford Housing for the Elderly — Project E-121, this is to notify you that you are to terminate your work on said project immediately. This notice is being given by reason of your persistent disregard of the instructions of the architect and/or the Housing Authority; for failure to observe or perform the provisions of the Contract documents; for substantial violations of the provisions of the Contract documents; for failure to prosecute the work with such diligence as well as cause its completion within the time specified in the contract."
The first three reasons for the termination are governed by Paragraph 6(A) of the General Conditions of the contract between the parties. This reads in part: CT Page 11657
 "All material and workmanship (if not otherwise designated by the Specifications) shall be subject to inspection, examination and test by the Local Authority, the Architect, and the Department of Community Affairs, at any and all times during manufacture or construction . . . The Local Authority, on its own initiative, or at the request of the Department of Community Affairs, shall have the right to reject defective material and workmanship, or require its correction. Rejected workmanship shall be satisfactorily corrected. Rejected material shall be promptly segregated, and removed from the premises and satisfactorily replaced with proper material, without cost to the Local Authority. If the Contractor fails to proceed at once with the replacement of defective material or workmanship, the Local Authority may by contract, or otherwise, have the defects remedied, or rejected materials removed from the site. The cost of same will be charged against any monies which may be due the Contractor without prejudice to any other rights or remedies of the Local Authority in the premises."
Under the provisions of Paragraph 13(A) of the General Conditions the plaintiff was required to follow and carry out the instructions of the architect and/or the Housing Authority, to observe and perform the provisions of the Contract Documents and not to violate in any substantial way the provisions of the Contract Documents.
It is unnecessary to discuss the details of these claimed, problems because the documents entitled "Periodical Estimate For Partial Payment" show that the plaintiff must have done the work so; required by the above numbered paragraphs set out in the Periodical estimates #1 through #5. The last one relevant to this inquiry is #5 concerning the period from January 1, 1981 to January 31, 1981.
The Clerk of the Works daily reports states that the job was shut down by the plaintiff at 2:30 P.M. on January 30, 1981 and work resumed on June 8, 1981.
Periodical Estimate #5 stated that the Total Value of Work Performed to Date was $224,154 and that the work performed during the period covered by Periodical Estimate #5 was $35,170.20. This CT Page 11658 document was signed by all concerned.
If the plaintiff has failed to follow and carry out the instructions of the architect and/or the Housing Authority, or had failed to observe and perform the provisions of the contract documents or had violated in any substantial way the provisions of the contract demands, such work would not have been paid for in Periodical Estimate #5.
After the plaintiff resumed work on the project in June 8, 1981, the architect and a representative of the defendant and of the state went over the project and prepared a check list of items which had to be corrected. It was a very thorough check, as one of the items to be corrected was the removal of a bird's nest from the attic space of one of the buildings.
Obviously, had the plaintiff disregarded the instructions of the architect concerning the work, or had failed to observe or perform the provisions of the contract documents or had violated in any substantial way the provisions of the contract documents, any work involved in these matters would not have been included in the work to be paid for and would have been on the check list of work to be done.
This conclusion follows from an examination of the various certificates to be signed in the Periodical Estimates Form.
First, the Treasurer of the plaintiff certifies that all just and lawful bills against the plaintiff and its subcontractors for labor, material and equipment employed in the performance of the contract have been paid in full in accordance with the terms and conditions of the contract.
Second, the Architect certifies that he has checked and verified this Periodical Estimate for the period stated and that to the best of his knowledge and belief it is a true statement of the value of the work performed and/or materials included in the estimate has been inspected by him or by his duly authorized assistants and that such work has been performed and supplied in full accordance with the plans and specifications of the construction contract and/or duly authorized deviations, substitutes, alternatives or additions all of which have been duly approved by the authorized agent of the Housing Authority and therefore he approves the balance due this payment. CT Page 11659
Third, the Chairman of the Housing Authority certifies that he has checked and verified this Periodical Estimate for the period stated, that to the best of his knowledge and belief it is a true and correct statement of the work performed and/or material supplied by the contractor, that all work and/or material included in this Periodic Estimate has been inspected by him and/or his duly authorized representatives or assistants and that it has been performed and/or supplied in full accordance with the terms and conditions of the construction contract, drawings, plans and specifications and/or duly authorized deviations, substitutes, alterations and/or additions, all of which have been authorized or conditionally approved by the duly authorized agent of the Housing Authority.
Any finally, the Clerk of the Works and the Assistant, Engineer, Department of Community Affairs of the state signs at the bottom.
Whatever the defendant was complaining about concerning the plaintiff's disregarding the instructions of the architect, or failing to observe and perform the provisions of the contract or violating in any substantial the provisions of the contract, its Chairman now has specifically certified that "it (the work) has been performed. . . .in full accordance with the terms and conditions of the construction contract, drawings, plans and specifications, . . . ." Mr. Manzi, Chairman of the defendant so certified on February 13, 1981 as to Periodical Estimate #5. Mr. Manzi's predecessor, Charles Kukurski, had also so certified on October 22, 1980 to Periodical Estimate #1, and had so certified on November 22, 1980 as to Periodical Estimate #2. Mr. Manzi himself had also so certified on December 17, 1980 as to Periodical Estimate #3, and so certified on January 19, 1981 as to Periodical #4.
The court points out that the Assistant Engineer of the Department of Community Affairs of the State had signed each Periodical Estimate at the bottom of each Periodical Estimate, thus approving, without qualification, everything stated in the Estimate above his name, as did the Clerk of the Works in each instance.
The defendant also claimed in its letter if July 24, 1981 that the plaintiff failed to prosecute the work with such diligence as would insure its completion within the time specified in the contract. Paragraph 2(A) of the Agreement of the parties reads: CT Page 11660
 "The work shall be started September 1, 1980 and the entire project, exclusive of landscaping, shall be completed in Three Hundred and Sixty-five (365) Consecutive Calendar Days"
Before the work resumed in June the plaintiff wrote the defendant that the work would be completed by September 1, 1981. The court also notes that Paragraph 4(A) of the contract provided for liquidated damages for any delay computed on the basis of 3 dollars per dwelling unit per day for lost rental income. The defendant therefore could not be hurt financially by any delay past the complete on date of September 1, 1981.
All the above convinces the court unqualifiedly that the four (4) claims of the defendant concerning the actions of the plaintiff have no merit whatsoever.
But even if there were any merit in the four claims of the defendant in its termination letter, that letter is a nullity because over the course of the plaintiff's work on the project from the date the work started until July 24, 1981 the defendant had waived any right to terminate the contract by the letter of July 24, 1981.
Section 13(A), "Right of Local Authority to Terminate Contract" the General Conditions reads in part:
 "If the contractor should. . . . persistently disregard instructions of the Local Authority or Architect, or fail to observe or perform the provisions of the Contract Documents, or otherwise be guilty of a substantial violation of any provisions of the Contract Documents, then the Local Authority may, by written notice to the Contractor, without prejudice to any other rights or remedies of the Local Authority in the premises, terminate the Contractor's right to proceed with the work . . . ."
The record is replete with instances where the plaintiff had done work incorrectly or in a sloppy manner and the defendant had discussed the situation with the plaintiff at length, pointed out how the work had keen done improperly, let the plaintiff do the work over and then paid it for the corrected work. (See for instance the check list of items referred to above prepared after the plaintiff had resumed work in June 1981, which list included CT Page 11661 the bird's nest) Having adopted over the months since the work began a manner in handling mistakes or omissions in the work done, the defendant now cannot terminate the contract for work that had been done incorrectly, had been corrected after discuss ions with the plaintiff, and had been paid for. If the defendant at any time wanted to be able to do that, it was required to give the plaintiff notice that from that date on in the future, all work had to be done correctly and to conform to the contract documents. Then after such notice if the plaintiff should disregard the instructions of the Local Authority or fail to observe or perform the provisions or the Contract Documents or be guilty of substantial violation of any, provision of the Contract Documents, then the defendant will have the right to terminate the plaintiff's right to proceed with the work. Failure to give the plaintiff such an order, considering the background of the work up to July 24, 1981 did not so terminate the contract. See Wooley v. Williams, 105 Conn. 671, 678 (1927).
Thus the letter of July 24, 1981 is substantively and procedurally a nullity as far as terminating the contract is concerned and did not terminate the contract or compel the plaintiff twelve the site, remove its materials and tools and do no more work on the project and has breached the contract and has damaged the plaintiff thereby.
 II.
Damages
 A.
The Original Contract
In the above section the court has found that the defendant has breached the contract with the plaintiff by improperly terminating the contract. The amount of damages resulting to the plaintiff is found by putting the plaintiff in the same situation financially as if it had been able to complete the work required by the contract. That means that if the contract allowed the plaintiff to make a profit on the work, the plaintiff must prove what that profit would be considering what it would be paid if the work on the contract were all done and what its expenses would be had the plaintiff done all the work required by the contract.
The plaintiff claims that it would have made a profit of $39,354.96 had it been allowed to finish the work required by the CT Page 11662 contract. To determine that it would have made a profit and what profit would be requires an analysis of all the work done and to be done under the contract. The plaintiff included in its brief such an analysis. It took the contract price of $655,990, adjusted that amount for the change orders that were approved and deducted from that amount the expense it had incurred for its work up to the termination plus the cost to complete the work which had to be done when, it was ordered off the job. That method of procedure is obviously the only way to calculate mathematically what the plaintiff's profits would be.
The court accepts that analysis and the computations done on that analysis and finds a as fact that the plaintiff's lost profits are $39,354.96. The court notes that such a figure cannot be computed by using the figures contained in the Periodical Estimates' for payment. Obviously from the plaintiff's figures in this analysis the plaintiff had done a large amount of work for which it did not ask for payment in the Periodical Estimates.
In addition to that amount the court finds that the plaintiff is entitled to recover other moneys for work completed prior to the alleged termination.
In each Periodic Estimate the plaintiff computed the work claimed to be done and for which the plaintiff was asking to be paid. The involved individuals — as stated above — then approved the figures put forth by the plaintiff and then deducted 10% of the amount due the plaintiff which was to be retained until the entire project had been completed. That retainage in the Periodic Estimate #5 for the period of June 1, 1981 to June 31, 1981 shows that the retainage for the work performed in that Periodic Estimate was $22,415.40.
The plaintiff resumed work on the project on June 8, 1981. The plaintiffs then prepared Periodic Estimate for the period of February 1, 1981 to June 30, 1981. The plaintiff was terminated before that document could be processed. However, the document states that the cost of the work performed since Periodic Estimate #5 for the period January 1, 1981 to January 31, 1981 was $35,170.20. That latter Periodic Estimate also shows that materials of the value of $16,909.81 had been brought to and stored on the premises since the previous Periodic Estimate. That material was taken by the defendant as it stated in its letter of July 24, 1981.
The plaintiff continued work after June 30, 1981 until it was CT Page 11663 terminated on July 24, 1981. There is no detail of the amount of work performed by the plaintiff up to that date. However, the Clerk of the Works daily reports shows that the plaintiff had men on the job regularly up to the termination date. The court finds that it is reasonable to believe that the plaintiff did the same amount of work as it claimed it had done in the Periodic Estimate #5 for the period of February 1, 1981 to June 30, 1981 or $35,170.20, and also, for the period of July 1, 1981 to July 24, 1981, or $35,170.20 more.
The court finds that the plaintiff is entitled to be paid for the work due on the contract and materials taken by the defendant as follows from the figures set out above.
 Retainage — $22,415.40 Materials taken — 16,909.81 Work 1/7 — 1/31 — 35,170.20 Work 2/1 — 6/30 — 35,170.20 Work 7/1 — 7/24 — 35,170.20 ----------- 144,835.81
That amount plus the lost profits of $39,354.96 totals $184,190.77 which is the damages the plaintiff sustained by the illegal termination of the contract by the defendant.
 B.
The Plaintiff's Future Losses
When the plaintiff was awarded the contract to build the North Branford housing complex, it was required to post a surety bond to guarantee its obligations under the contract. At the time that the defendant was considering terminating its contract with the plaintiff, the St. Paul Fire and Marine Co., the surety on the bond, was a participant in the discussions about the contract and the proposal to terminate it. Eventually the surety company cancelled its bond. This action prevented the plaintiff from getting a bond from any surety company on any other building contract for the state or for any of the municipal corporations of the state. And, although the plaintiff tried to get other bonds for other work it could not and thus was prevented from earning any profits doing such work.
The plaintiff had been incorporated in 1979 and in 1980 had CT Page 11664 successfully bid for the work with the defendant and for similar work for elderly housing in Waterbury and Watertown. The contract with Waterbury was made January 26, 1981 for a price of $794,500. The contract with Watertown was made on March 6, 1981 for a price of $1,071,000. The plaintiff used non union men so its labor costs were lower than other companies using union men. The plaintiff was obviously an aggressive competitor in this particular building contract area.
Each year the Department of Housing of the state of Connecticut issues a survey of construction Activity by Building Permits for Housing Units in Connecticut. The estimated cost of housing construction authorized by Building Permits in 1980 was $1,234,971,463. This figure grew steadily to a peak in 1987 of $2,331,127,817 then dropped off to $1,938,013,703 in 1988 and to $1,442,692,110 in 1988.
It is fair to infer that an aggressive company such as the plaintiff, which had gotten two other contracts similar to the one involved in this case in the two years after it had been incorporated, would have been able to successfully bid and obtain at least one contract for each year following 1981 in that specific housing area. Taking the profit it would have made of just short of $40,000 or. the North Branford job as a basis for a profit for one job in each of the seven years succeeding 1981 up to and including 1988, computes to a loss profit for those latter seven years of $280,000.
IT is perfectly obvious to the court that if the plaintiff were applying for a surety bond for any surety company other than the St. Paul Insurance Company, the plaintiff would have to fill out an application for such surety bond to that surety company. It is inconceivable to the court that one of the questions on that application the plaintiff would have to fill out, would not be an inquiry whether or not the plaintiff had ever been denied a bond by any other surety company, or if the plaintiff had obtained such a bond, whether that bid had been cancelled for any reason, and, if so, what that reason was. It is a matter of common sense that any application the plaintiff would have to fill out would include such questions. The court has the right to take judicial notice that any such application would include such questions and also that if the plaintiff answered questions honestly and revealed what happened in the North Branford Case, the application would be denied. That in fact must have happened to the plaintiff in the two or three instances after the North Branford case when it tried to act such CT Page 11665 a surety bond and was refused. The defendant through its attorney knew or should have known that such result would follow from its termination of the contract by the letter of July 24, 1981, when the plaintiff would try to get a surety bond to do other work similar to the North Branford job.
The court has found that the defendant had no legal right to terminate its contract with the plaintiff. It necessarily follows that the defendant is liable to the plaintiff for the losses it sustained by being unable to get other contracts to do work similar to the North Branford job in the ensuing seven years.
JUDGMENT
Judgment may enter for the plaintiff to recover of the defendant on the complaint $464,190.77 plus interest and costs and for the plaintiff on the counterclaim.
THOMAS J. O'SULLIVAN TRIAL REFEREE